

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-0268-21

---

### DARYL JOE, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE TENTH COURT OF APPEALS
### NAVARRO COUNTY

---

KEEL, J., delivered the opinion of the Court, in which KELLER, P.J., and RICHARDSON, YEARY, NEWELL, SLAUGHTER, and MCCLURE, JJ., joined. WALKER, J., filed a dissenting opinion. HERVEY, J., concurred.

## O P I N I O N

Appellant was charged with and convicted of cargo theft. Tex. Penal Code § 31.18. He challenges the legal sufficiency of the evidence to support his conviction. He argues that the goods were not cargo, he was never in possession of the goods, and even if he possessed the goods, he did not conduct an activity in which he possessed stolen cargo. We conclude that the goods were cargo, and Appellant possessed the

goods.   We remand the case to the court of appeals for consideration of whether Appellant conducted an activity in which he possessed stolen cargo.

## I. Background

The goods at issue are mattresses and box springs made by Corsicana Bedding. Corsicana Bedding has loading docks at its factory and a shipping yard within its gated grounds.[1] Mattresses and box springs are loaded into trailers at the loading docks. When the trailers are full, they are sealed with the necessary paperwork inside and moved to the shipping yard where they await transport to their intended destinations by third-party truckers who unseal the trailers to check their contents and paperwork.

Corsicana Bedding used JB Hunt trucking company as its third-party, in-house carrier.   Around 60 JB Hunt driver employees regularly drove for Corsicana Bedding and had gate codes for the shipping yard.   During peak times, JB Hunt contracted with 10-15 outside carriers to ship Corsicana Bedding's goods.   Only JB Hunt trucks were authorized to take JB Hunt trailers, and only JB Hunt drivers were authorized to pick up trailers without first checking in with Corsicana Bedding shipping personnel.   Drivers for outside carriers received gate codes from their dispatchers and were required to check in at the loading dock to confirm the pick-up number and destination for the load.

---

1 Several exhibits, including photos of the facility and videos of the entrance gate, were admitted for demonstrative purposes only and thus were not included in the appellate record.   We note for future cases that such exhibits may aid a legal sufficiency evaluation.

When Appellant arrived at Corsicana Bedding, he was driving a blue Volvo semi-truck with no license plate and with cardboard covering the trucking company information. He entered the shipping yard without using a gate code when the gate opened for another truck. Without checking in with shipping yard personnel, Appellant backed his truck under a loaded JB Hunt trailer, causing it to automatically connect to his truck. The next steps for hooking up the trailer were to manually connect lines for brakes and lights and raise the jacks. Appellant had not yet taken these steps when he was approached by Corsicana Bedding employees.

The shipping yard supervisor, Juan Carlos Perez, was suspicious because Appellant was not driving a JB Hunt truck but was in the process of hooking up to a JB Hunt trailer. Perez also found it suspicious that the company information on the side of the truck was covered. Perez took photos of Appellant while he was out of the truck to connect the lines for the air brakes and the lights.

The plant manager, Raphael Lemus, asked Appellant where he was taking the load. Appellant did not have paperwork or know the intended destination for the trailer. He showed Lemus a number he had written on his hand that was supposed to be the trailer number for the load he was sent to pick up. Appellant called his dispatcher and gave the phone to Lemus, but there was a bad connection, and Lemus could get no information from the dispatcher. Lemus had someone call the police. Appellant left the shipping yard without the trailer and went to a nearby gas station where he was later arrested.

Appellant told the police he had been employed for four days as a driver for Holland Trucking Company and that a man named Cliff had paid him cash to pick up the trailer. Cliff had covered the information on the side of the truck and told Appellant to remove the expired temporary tag that had been displayed in the truck's window. Police found the temporary tag registered to Clifford Lewis inside the truck. An investigator with the district attorney's office testified that he believed Lewis was involved in the incident, but there was not enough evidence to arrest him.

Lewis refused to testify at Appellant's trial, but his interview with the investigator was played for the jury. In the interview Lewis denied any involvement in the incident at Corsicana Bedding. He told the investigator the truck was owned by his friend, Harley, who allowed Appellant to live in the truck. Lewis said "Stephen" hired Appellant to pick up the load. According to Lewis it was "supposed to be a legit load" and Appellant had a pick-up number, but something was not right with the number when Appellant arrived to pick up the load.

The jury charge included an instruction on the lesser offense of attempted cargo theft. The jury found Appellant guilty of cargo theft, and the court assessed a sentence of 37 years.

## II. Relevant Statutes

A person commits cargo theft if he "knowingly or intentionally conducts, promotes, or facilitates an activity in which he receives, possesses, conceals, stores,

barters, sells, abandons, or disposes of" stolen cargo or cargo explicitly represented to

him as being stolen cargo.   Tex. Penal Code § 31.18(b)(1)(A)-(B).   "Cargo" means

> goods, as defined by Section 7.102, Business and Commerce Code, that
> constitute, wholly or partly, a commercial shipment of freight moving in
> commerce.   A shipment is considered to be moving in commerce if the
> shipment is located at any point between the point of origin and the final
> point of destination regardless of any temporary stop that is made for the
> purpose of transshipment or otherwise.

*Id*. at § 31.18(a)(1).   A person commits theft if he unlawfully appropriates property with

intent to deprive the owner of property.   *Id.* at § 31.03(a).   "Appropriate" means "to

acquire or otherwise exercise control over property."   *Id.* at § 31.01(4)(B).   A person

commits attempted theft if, with specific intent to commit theft, "he does an act

amounting to more than mere preparation that tends but fails to effect the commission of

the offense intended."   *Id.* at § 15.01(a).

## III. Court of Appeals

The court of appeals affirmed Appellant's conviction.   *Joe v. State*, 620 S.W.3d

834, 838 (Tex. App.—Waco 2021).   It concluded that the goods were cargo and were

"moving in commerce" because a bill of lading had been issued which transferred

possession of the goods from the manufacturer to the carrier.   *Id.* at 836-37.   The fact

that the goods were still in the shipping yard did not matter because that was merely a

temporary stop.   *Id.* at 837.

As for possession of the goods, the court of appeals found it irrelevant that

Appellant could not have moved the trailer without having hooked up the brake lines or

raised the lifts. *Id.* at 837-38. The court of appeals looked to the general theft statute and reasoned that asportation—the act of carrying away or removing property—is not an element of theft, so Appellant's inability to move the cargo was irrelevant. *Id.* The court said Appellant engaged in conduct, i.e., hooking up the trailer to his truck, that demonstrated possession of the goods. *Id.* at 838.

The dissent questioned whether Appellant was actually hooked up to the trailer as he had taken only the first step in the multi-step process required for the hook up. *Id.* (Gray, J., dissenting). According to the dissent, this was an attempt to steal the cargo, but Appellant never took possession. *Id.* at 838-39. The dissent also disagreed with the majority's focus on the bill of lading to determine whether the goods were "moving in commerce." *Id.* at 839. The dissent would have focused instead on the physical location of the goods. *Id.* Goods are not yet moving in commerce if they are still at their point of origin. *Id.* But the goods had left their point of origin when they moved from the loading dock to the shipping yard even if the shipping yard was within the perimeter of the manufacturing facility and warehouse. *Id.* The dissent said the goods were moving in commerce within the definition of the cargo-theft statute, but Appellant never possessed the goods. *Id.*

## IV. Legal Sufficiency of the Evidence

In assessing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v.*

*Virginia*, 443 U.S. 307, 319 (1979).   The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts.   *Id.*

Appellant was found guilty of intentionally and knowingly conducting an activity in which he possessed stolen cargo, namely, mattresses and box springs, by hooking up the truck he was driving to the trailer that contained the cargo.   If the jury were to convict, it had to find that the goods were cargo, Appellant possessed the cargo, and Appellant conducted an activity in which he possessed stolen cargo.

## IV. A. Were the Mattresses "Cargo"?

"Cargo" means goods that constitute "a commercial shipment of freight moving in commerce."   Tex. Penal Code § 31.18(a)(1).   A shipment is "moving in commerce if [it] is located at any point between the point of origin and the final point of destination regardless of any temporary stop that is made for the purpose of transshipment or otherwise."   *Id.*

Appellant argues that the mattresses were not cargo because, as a matter of law, they were never moving in commerce.   He maintains that they never left their point of origin at Corsicana Bedding and that differentiating between its loading dock and its shipping yard stretches the meaning of "point of origin."   He cites internet definitions of "point of origin" that suggest that the shipping yard was part of the point of origin, e.g., "the location at which a shipment is received by a transportation line from the shipper." Appellant's Br. p. 13 (citing *point of origin definition,* USLEGAL.COM,

https://definitions.uslegal.com/p/point-of-origin (last visited June 2, 2022)).   But he does

not argue that "point of origin" has acquired a technical or particular meaning whose

usage would be required by the Code Construction Act.   *See* Tex. Gov't Code §

311.011(b) ("Words and phrases that have acquired a technical or particular meaning,

whether by legislative definition or otherwise, shall be construed accordingly.").   And

we find no evidence that "point of origin" has acquired such a meaning.

The phrase does not appear in Black's Law Dictionary.   The United States

Supreme Court has deemed it not to be technical.   *W.P. Brown & Sons Lumber Co. v.*

*Louisville & N.R. Co.*, 299 U.S. 393, 397 (1937) (declaring railroad tariff formulas that

depended on "through rates" that were "in effect from point of origin to destination" to be

"not technical" but "clear").   And it has no common-law history suggesting a technical

meaning.   *See Medford v. State*, 13 S.W.3d 769, 772 (Tex. Crim. App. 2000)

(concluding that "arrest" had acquired a technical meaning because it had a long,

established history in the common law); *cf. Green v. State*, 476 S.W.3d 440, 445 (Tex.

Crim. App. 2015) (concluding that the terms "penetration" and "female sexual organ" are

common terms that have not acquired a technical meaning).   Consequently, the phrase

"shall be read in context and construed according to the rules of grammar and common

usage."   Tex. Gov't Code § 311.011(a).

In common usage "point of origin" means the place where something comes from

or originates.   *See, e.g.*, *point of origin definition*, MERRIAM-WEBSTER.COM,

http://merriam-webster.com/dictionary/pointoforigin (last visited May 5, 2022).   The

context of the phrase includes the statute's discounting of "any temporary stop[.]" Tex. Penal Code § 31.18(a)(1). So the issue is whether the evidence was legally sufficient to show that the trailer was between the place where it originated or came from and its final destination, regardless of any temporary stop it made.

The evidence showed that the loaded trailer had been shuttled via a "yard truck" from the factory to the shipping yard. A rational jury could find from that evidence that the shipment originated or came from the factory, and the loaded trailer made a temporary stop at the shipping yard. Neither the proximity of the shipping yard to the factory nor Corsicana Bedding's ownership of both facilities defeated as a matter of law the factory's status as the point of origin. Thus, the evidence was legally sufficient to support the jury's finding that the mattresses and box springs were moving in commerce and therefore were cargo.

## IV. B. Could a Rational Jury Find that Appellant Possessed the Mattresses?

The jury found Appellant guilty of conducting an activity in which he possessed stolen mattresses by "hooking up" his truck to the trailer that contained the mattresses. Appellant argues that no rational jury could so find because backing the truck under the trailer did not amount to "hooking up" the trailer, the trailer could not move without the brake lines having been connected and the lifts having been raised, the trailer never left the shipping yard, and Corsicana Bedding always had control over the trailer and its contents. These arguments fail because a rational jury could have concluded that he hooked up when he backed the truck under the trailer, and in doing so he exercised

control over the trailer and its contents. Furthermore, possession of property does not depend on exclusive control of it or its removal from one location to another.

"'Possession' means actual care, custody, control, or management." Tex. Penal Code § 1.07(a)(39). "Control" is not legally defined. Thus, the jury was free to give it "any meaning which is acceptable in common parlance." *See Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012) (quoting *Denton v. State*, 911 S.W.2d 388, 390 (Tex. Crim. App. 1995)). The jury was also permitted to draw reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) (an inference is a conclusion reached by considering other facts and deducing a logical consequence from them). The reasonableness of a jury's inferences depends on the combined and cumulative force of all the evidence viewed in the light most favorable to the verdict. *Id.* at 16-17.

Exercising control over property does not depend on removing it from a place. *See State v. Ford*, 537 S.W.3d 19, 24 (Tex. Crim. App. 2017) (upholding probable cause to arrest for theft where defendant exercised control over property by placing it in her purse even while still in the store); *Hill v. State*, 633 S.W.2d 520, 521 (Tex. Crim. App. 1981) (orig. op.) (holding that an exercise of control over property does not require its removal from premises). Nor does it depend on exclusive control. *See De la Torre v. State*, 583 S.W.3d 613, 619 (Tex. Crim. App. 2019) (recognizing "concept of joint possession").

The evidence shows that Appellant backed the truck underneath the trailer, which automatically connected the two. He was out of the truck trying to connect the brake lines and lights when Perez showed up and started taking photos of him. Lemus testified that the truck was connected to the trailer because it was backed underneath the trailer, and a driver who completes that step has control over the trailer. Looking at this evidence in the light most favorable to the verdict, a rational jury could conclude that Appellant exercised control over the trailer and its contents. Appellant's failure to finish hooking up the trailer or to remove it from the shipping yard did not compel the jury to find he did not exercise control over the trailer.

**IV. C. Did Appellant conduct an activity in which he possessed stolen cargo?**

Property is "stolen" at the moment it is acquired by theft. *Stewart v. State*, 44 S.W.3d 582, 587 (Tex. Crim. App. 2001). Appellant argues that even if he possessed the mattresses, making them stolen cargo, any activity he is alleged to have conducted occurred before the cargo became stolen. He says the cargo theft statute was not intended to reach his conduct, and the evidence did not establish a violation of the statute. He relies on *Lang v. State*, 561 S.W.3d 174 (Tex. Crim. App. 2018), and its interpretation of the organized-retail-theft statute. Although this issue was raised on appeal, the court of appeals failed to address whether Appellant conducted an activity in which he possessed stolen cargo, so we remand the case to it to consider this issue.

**V. Conclusion**

The mattresses were cargo, and Appellant possessed them, but the cargo-theft statute requires an additional element that the court of appeals failed to address. We remand the case to the court of appeals for consideration of whether Appellant conducted an activity in which he possessed stolen cargo.

Delivered: June 22, 2022

Publish